Harding *v.* Stamford Water Co.

————•◆•————

WILLIAM C. HARDING AND ANOTHER *vs.* THE STAMFORD WATER COMPANY.

A woolen mill was established on a water course, which it used in part for power and in part for washing its wool, the supply in dry seasons being sufficient only for the latter. Afterwards a corporation, under a charter from the legislature, purchased a tract of land four miles above on the stream, and

at that point diverted a portion of the water to the borough of *S*, for the domestic use of the inhabitants, and for manufacturing and other purposes. The charter contained a provision that the corporation should be liable to no damages for taking the water. The owners of the mill brought a petition for an injunction, pending which the corporation procured an amendment of its charter providing for compensation for property taken. The petitioners had not known of the existence of the charter until two years after it was granted, but as soon as they learned of the intention of the corporation to divert the stream had given notice to one of the directors that they did not consent to it, and as the work was progressing had again given like notice. The diversion of the water was no damage to the petitioners except during the dry season. The corporation had constructed a reservoir upon a branch of the stream, by which water was stored for use in the dry season, and which at such times added to the quantity in the stream, and would have benefited the petitioners but for the diversion to the borough of a great part of the quantity thus added. Held—

1. That the diversion was one which the respondents as riparian proprietors had no right to make.

2. That the provision of the charter giving them power to take the water without making compensation was unconstitutional and void.

3. That it would seem that the diversion of the water for manufacturing purposes, although to be regarded as a public use, could not be authorized, while the stream was already used by the petitioners for manufacturing purposes.

4. That the respondents could not justify themselves for the diversion by the fact that they had provided the reservoir for supplying water to the stream in dry seasons, since the additional supply, even if adequate, was controlled wholly by the respondents, and for their own interest.

5. That the petitioners could not be regarded as having slept upon their rights.

6. That, in view of the amendment of their charter providing for compensation, the court in its discretion would allow the respondents time to make compensation, and if not made, that a perpetual injunction should be granted.

PETITION for an injunction ; brought to the Superior Court in Fairfield County. Facts found and case reserved for advice. The facts are sufficiently stated in the opinion.

*J. Halsey* and *Curtis*, for the petitioners.

*R. D. Hubbard* and *Child*, for the respondents.

FOSTER, J. From the report of the committee in this case, which is found true and accepted by the court below, it appears that the plaintiffs now are, and ever since December, 1867, have been, the owners in fee and occupiers of the property described in their bill. That property consists of certain real estate in Stamford. situated near the mouth and

on both sides of Mill River. There is a manufacturing estab-lishment on said premises, fitted with ten sets of woolen machinery, and a water power connected with the same, fur-nished by said Mill River, having a head and fall of eight and a half feet. The dam across the stream has a roll-way of a hundred and thirty to a hundred and fifty feet, and flows about five acres. Steam power is used in aid of the water power to operate said mill, and both are necessary to drive all the machinery at full speed. Besides the use of the water of the stream as power it is also used by the plaintiffs for washing and cleansing the wool to be manufactured, and for washing the cloth when manufactured. A supply of water for these purposes is indispensable to the operation of the establishment as a woolen mill. One hundred and seventy-five hands are employed, and the value of the works is about $150,000.

The defendants were incorporated by the General Assembly of this state in 1868, with certain powers and privileges set forth in their charter. Acting under the authority conferred by that instrument, they procured title to about thirty acres of land lying on both sides of said Mill River, at a place called Cox's dam, about four miles above the mill of the plaintiffs, at the site of an ancient grist and saw mill. There the defendants have erected a dam of the same height as the old one, and from said dam have laid a main pipe, twelve inches in diameter, to the borough of Stamford, and have also laid distributing pipes from said main pipe, through the streets and avenues of Stamford, for the purpose of supplying the inhabitants, so far as they may desire to use the same, with water from said river.

The defendants' works were so far completed that water was first drawn through said pipes, from said river, on the 4th day of July, 1871; and since that time it has continued to be used, in and near the borough of Stamford, for various purposes. At the date of the report, the defendants were supplying water for one hundred and eighty families, for divers garden and fire hydrants, numerous stores, public buildings, and factories, public and private fountains, for

watering the streets in said borough ; also for supplying the depot of the New York and New Haven Railroad Company, and the locomotive engines running on said road, and the steamboats at the wharves. From the increase of the population of the borough, and the increase in the use of the water, the diversion of the water will naturally and necessarily be increased in the future.

For the purpose of obtaining a certain and steady supply of water at all seasons, the defendants, jointly with two other persons, one the president, the other the treasurer of the defendants' company, procured title to a tract of land upon one of the branches of Mill River, at a place called Trinity Lake, situated about fourteen miles above the premises of the plaintiffs, and raised a dam at the outlet of said lake twelve feet high; and thereby store up, and detain the water falling upon the water shed of said lake, above said dam, for a supply when needed. Trinity Lake, and the water shed so purchased, is about one twenty-fifth part of the entire water-shed of Mill River. All the water gathered in the lake would, of necessity, whenever drawn, flow through the lands of the plaintiffs, and form a part of their water power, unless diverted from the stream. The defendants draw the water from Trinity Lake and divert it at Cox's dam with reference to the interests of the water company, and not with reference to the interests of the plaintiffs, doing the same under a claim of right.

The committee was not enabled from the evidence to find the precise amount of water now diverted by the defendants from Mill River. It is not sufficient to constitute an appreciable damage to the plaintiffs, except during the dry season, when there is a deficiency of water for power, and for washing. During such seasons, and these have occurred every year since the plaintiffs have occupied the premises, the amount of water diverted is and has been a source of damage to the plaintiffs, and this damage will naturally increase if the diversion is continued. The fact that the defendants have diverted the water under a claim of right, and that the amount diverted will doubtless be steadily increasing in

future, affects injuriously the market value of the mill and privilege. At the date of the petition, the water company had expended about $115,000, and at the date of the report, about $125,000.

These are the controlling facts in the case.

The answer of the defendants puts their defense substantially on the ground that the water of the stream is diverted for public use ; that the plaintiffs have not suffered damage by the diversion ; that the charter of the defendants exempts them from any liability for damage so done ; and that the water accumulated and stored by them in Trinity Lake so increases the capacity of said stream as to compensate for the quantity of water diverted.

We certainly cannot hesitate to say that the property rights of these plaintiffs are infringed upon by these defendants. The infringement produces damage at the present time, and there is a probability, amounting almost to a certainty, that the damage done will be constantly increasing, until, possibly, all the water of the stream shall be diverted from the plaintiffs' land and mill.

That the taking of the water of this stream to supply the inhabitants of the village of Stamford with water, is a taking for public use, admits of no question, nor can the power of the legislature to take property for such use be for a moment questioned. The charter of the defendants however does not restrict them to supplying water to the village for public and domestic use alone ; it may be used " for manufacturing and other purposes." It gives no preference to either one of these objects over the other. The defendants are left free to exercise their own option in that respect, and for aught appearing in their charter to the contrary, they may apply all the water which they divert from the stream to manufacturing purposes. This it may be said, and doubtless with truth, is a public use. Our flowage laws recognize mills and manufacturing establishments as being for public use, and so authorize the taking of private property to establish and sustain such works. But the plaintiffs are now using the water of this stream, the whole of it, for manufacturing purposes,

and in the dry season they require more power to run their machinery than the whole stream furnishes. Can the legislature authorize another party to divert this power, and apply it to another manufacturing establishment, perhaps of precisely the same character? Can they ruin one establishment, running for public use and convenience, to build up another of the same description, to run for like use and convenience?

It is unnecessary to pursue this inquiry, or to decide the questions involved in it, for this case is rested on other grounds.

We regard the plaintiffs as having a right in this stream of water; a right to use it for every useful purpose to which it can be applied; a right to have it run as it is wont to run, without diminution or alteration. "This right," says Judge STORRS, in giving the opinion of the court in *Wadsworth* v. *Tillotson*, 15 Conn., 373, (he is speaking of running water,) "is not an easement, or appurtenance, but it is inseparably annexed to the soil, and is parcel of the land itself." These defendants then can have no more right to divert the water of this stream from the land of the plaintiffs, or to use the same, except in a reasonable manner for proper purposes as it passes over their land, than they have to take the mill of the plaintiffs, or the land on which it stands, and appropriate them to their own or to the public use.

But the charter, it is said, gives this right. That instrument, section 10, contains this singular provision: * * * " but no person, or persons, or corporation, shall be entitled to recover any damages from this company, on account of said company's use, for their purposes, of the sufficient supply of water from Mill River; and that no party or parties or corporation, shall be entitled to any damage from this company, because of the diversion of a part of the water of Mill River into the pipes of this company for the purpose of supplying the borough of Stamford with water."

We notice that a clause in this charter repeals a charter granted in 1859, incorporating the Stamford Water Company, with powers generally similar to those conferred by the present charter. In lieu of the provision which we have just

quoted, a most extraordinary one, giving authority to divert the water of Mill River with entire immunity for so doing, the charter of 1859, in connection with the same grant of power to divert the water, had this just proviso:  \*  \*  \*  " in no wise injuring the vested rights of any person or persons, or corporation or corporations, without making compensation therefor." 6 Priv. Laws of Conn., 267.

It seems almost superfluous to say, that under the constitution of this state private property cannot be taken for public use without just compensation. Indeed under no government but that of the most grinding despotism could such a power be exerted without such qualification. It violates the great principle of common right.

If the clause of the charter just quoted, or any other clause, was intended to effect the purpose of taking this stream of water, which we think is property as much under the protection of the constitution as the land over which it flows, without making compensation to the down-stream proprietors for the injury such taking might occasion, we are bound to pronounce each and every clause of that charter, having such an intendment, to be utterly void and of no effect. The claim on the part of the defendants, that the plaintiffs suffered no damage by the diversion of this water, is negatived by the finding, and we are clearly of the opinion that, as riparian proprietors, the defendants are not authorized to divert this stream in the manner they have done. The legislature has not conferred on them this power, and in our opinion cannot confer it, without providing compensation to those proprietors who may be injuriously affected by the diversion.

The claim of the defendants, that they have increased the capacity of this stream, by making a reservoir of Trinity Lake, which can be drawn from in the dry season, and so have made compensation for diverting the water, might be entitled to consideration if it appeared that the plaintiffs had the benefit of this increased capacity. The contrary in fact appears. The defendants accumulate this water fo rtheir own benefit, and draw it at their own pleasure, to promote their own interests, and with no reference to the interests or wants of

the plaintiffs. The plaintiffs have no control over it. It was indeed intimated in the argument that the plaintiffs had never applied for leave to draw from this reservoir, and the committee states that the single mill owner who had so applied was not refused. We cannot deem this to be of much importance. To the suggestion that the plaintiffs have not asked for leave to draw this accumulated water, it might be sufficient to reply, that the defendants have not offered to grant the plaintiffs the privilege of doing so. But a right which depends solely on the will of another, if indeed it can be called a right, is too unsubstantial to be estimated. Under a government of law, rights are defined by law, and rest on a firmer basis than human caprice.

Much stress was laid by the defendants' counsel, in the argument, on what they insisted was the acquiescence of the plaintiffs in the proceedings of the defendants under their charter, until they had expended such an amount of money as to create rights and equities which ought not now to be disturbed by injunction.

Though the charter of the defendants was obtained in 1868, it appears that the plaintiffs had no knowledge of it till nearly two years after. When the plaintiffs were first informed of the purpose of the defendants to divert the water, they objected to one of the directors of the company, on the ground that it would be an injury to their mill. When the defendants began to dig the ditches, and prepare the pipes for laying, the plaintiffs again notified one of the directors that they should object to the diversion of the water, and a like notice was soon after repeated.

The defendants' work was so far completed that water was first drawn through the pipes on the 4th of July, 1871, when the plaintiffs applied to counsel for legal redress. The present bill, dated October 3, 1871, was brought to the next term of the Superior Court for the county of Fairfield.

The defendants insist that these notices to their directors were no notices to the company, and therefore are not to be regarded.

We are not prepared to say that the rights of these plain-

tiffs to this stream of water would have been forfeited, or even impaired, had they said or done nothing to protect those rights till they brought their present bill. It should be borne in mind that the question here is not, whether these notices were, technically, legal notices to the company, but whether the plaintiffs have so slept on their rights as not to be entitled to the relief sought. Looking at all the facts in the case, we are clearly of opinion that they have not. We discover nothing which would justify the defendants in inferring that the plaintiffs were prepared to acquiesce in the diversion of this stream of water. That they should submit, tamely and silently, to what might prove the utter ruin of their establishment is too unnatural and improbable a presumption to be entertained for a moment.

Our attention has been directed to the amendment made to the defendants' charter in 1872. See Priv. Laws of 1872, page 193. By this amendment, provision is made for compensating those whose legal rights may be injuriously affected by diverting the water of Mill River. We see no objection to proceeding under that amendment, and so providing adequate relief and protection to these plaintiffs.

We are all agreed that the plaintiffs are entitled to redress. The manner in which the equity powers of the Superior Court have been conferred by the legislature, admonishes us to be cautious in the exercise of those powers. We are not inclined to be swift to advise the granting of so extreme a remedy as injunction in the first instance. We advise the Superior Court to grant the defendants a reasonable time within which to make adequate compensation to the plaintiffs for the injury they sustain by the diversion of the water of Mill River, and if such compensation should not then be made, that the defendants be then enjoined, under a suitable penalty, from continuing such diversion.

With these qualifications we advise judgment for the plaintiffs.

In this opinion the other judges concurred.